IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| TINA L. HARRIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:14-CV-00031-NKL |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

**ORDER**

Before the Court is Plaintiff Tina Harris' appeal of the Commissioner of Social Security's final decision denying her applications for Title II disability insurance benefits and Title XVI supplemental security income benefits. For the reasons set forth below, the Commissioner's decision is affirmed.

**I. Background**

Plaintiff was born in June 1961, has a high school education, and has prior work experience as a retail clerk and cashier. Plaintiff alleges she became disabled on February 13, 2009, due to the combined effects of a mental condition, shoulder, knee, ankle, hand and leg pain, arthritis, depression, bone pain in the bottom of her feet while standing, congenital blindness in one eye, and increased vision problems. [Tr. 165].

**A. Medical History**

**1. Physical**

In 2004, Plaintiff had left shoulder surgery. [Tr. 226]. In November 2009, Dr. Ann Lee, M.D., conducted a consultative physical examination. Plaintiff reported pain in her back and arms, numbness and pain in her hands, bruising in her hips, problems with her knee, and trouble gripping. She reported losing a job due to poor attendance related to pain. *Id.* Dr. Lee observed that Plaintiff was healthy-appearing, had normal strength, 2+ reflexes, was able to get on and off the examination table independently, had normal gait, normal cervical spine range of motion, negative straight-leg raises, and mild right shoulder pain upon palpitation. Dr. Lee remarked that Plaintiff appeared to magnify her shoulder pain symptoms, put forth decreased effort during her shoulder examination, and had a wider range of motion when she was distracted. [Tr. 227]. Dr. Lee opined Plaintiff could lift 50 pounds occasionally and 20 pounds frequently. Her ability to stand, sit, or walk in an eight-hour day was not limited. [Tr. 228].

In January 2010, Plaintiff went to the emergency room complaining of back pain after a fall two weeks earlier. [Tr. 265-66]. She had decreased range of motion in her back and radiographs of her lumbar spine showed minimal anterior osteophyte formation, but she had normal alignment and vertebral heights with no fracture or dislocation, and the examination was normal. [Tr. 269]. Plaintiff was diagnosed with low back pain, treated with Flexeril, Percocet, and Bactrim, and told to follow up with her physician.

In June 2010, Plaintiff went to the emergency room and complained of pain and swelling in her right arm. [Tr. 252-53]. Her right elbow was swollen and had limited range of motion. An ultrasound and x-rays were negative for abnormalities. [Tr. 254-55]. Plaintiff was diagnosed with bursitis, treated with Naprosyn and Percocet, and

2

discharged. In December 2010, Plaintiff returned to the emergency room with complaints of back pain after lifting. [Tr. 245]. She was diagnosed with low back strain, treated with Toradol, Norflex, and Tylenol, and was told to rest, ice, elevate, and follow up with her primary care provider. [Tr. 246].

In August 2011, Plaintiff saw Dr. Steven L. Hendler, M.D. for a consultative physical examination. [Tr. 324-27]. She reported pain in her back, right shoulder, and feet, and numbness in her wrists and hands. She was taking Tylenol, Advil, Ibuprofen, and Benadryl. Plaintiff had normal strength, gait, and station, and no crepitus in her shoulders or elbows. Dr. Hendler observed that despite displaying severe pain when examined, Plaintiff was able to push her full body weight up and off of the examination table several times to adjust herself and showed no pain responses. [Tr. 326]. He observed that Plaintiff did more internal shoulder rotation when she was not being actively examined. *Id.* He assessed back and shoulder pain and left eye blindness. He opined that there were "no objective findings to preclude [Plaintiff] from standing and/or walking on an unlimited basis," that she may have impaired depth perception, and that her left shoulder would affect her ability to lift overhead. [Tr. 327].

On August 31, 2011, Plaintiff presented to Karen Clemens, N.P.-C., A.P.R.N., with complaints of left knee pain after falling down some steps. [Tr. 399-401]. Plaintiff stated that the pain affected her ability to complete daily activities, but that walking and Ibuprofen improved her pain. Ms. Clemens diagnosed knee pain, instructed Plaintiff to ice, rest, compress, and elevate her left leg, and encouraged her to use a knee brace and

crutches. [Tr. 400-01]. After additional complaints of knee pain, an MRI revealed a grade two medial collateral ligament sprain in Plaintiff's left knee. [Tr. 367, 397].

In January 2012, Plaintiff presented to Blake Donaldson, D.O., with complaints of knee pain and a cyst on her back. [Tr. 362-64]. She had normal strength, full range of motion, and no abnormalities in her right knee despite complaints of pain on extension. Dr. Donaldson diagnosed cellulitis, sebaceous cyst, and knee pain/knee stiffness, and prescribed medication. [Tr. 364]. During two appointments in January and April 2012, Plaintiff's examination findings were the same with the exception of complaints of heel pain. [Tr. 356-61]. An x-ray revealed bone spurs in Plaintiff's heel. [Tr. 360].

In May 2012, Plaintiff presented to Akilis Theoharidis, D.P.M., with complaints of heel pain aggravated with walking. [Tr. 395-96]. Dr. Theoharidis diagnosed bilateral foot pain and plantar fasciitis and prescribed night splints, arch supports, and medication. In July 2012, a physical examination was essentially normal, and Plaintiff was prescribed medication, night splints, icing, stretching, and good shoes and insoles. [Tr. 394].

**2. Mental**

In November 2009, Nina L. Epperson, M.S., conducted a consultative mental examination. Plaintiff reported a history of abuse, stated she was nervous around large crowds, and did not feel like bathing sometimes. [Tr. 218-21]. Plaintiff denied any prior mental health treatment. [Tr. 218]. She appeared depressed, and her short-term memory seemed impaired, but she was otherwise alert, oriented, and cooperative. Her long-term memory was intact, her intelligence was in the low-average range, her thoughts were organized and goal-directed, and her insight, judgment, and abstract thinking were intact.

[Tr. 220-21]. She was diagnosed with post-traumatic stress disorder, anxiety disorder, depressive disorder, and a global assessment functioning (GAF) score of 54. Ms. Epperson opined that Plaintiff would benefit from psychotropic medication.

In May 2011, Plaintiff presented to Ercilia Hernandez, L.C.S.W., for a psychosocial assessment. [Tr. 308-11]. She reported depression since childhood, difficulty sleeping, and visual and auditory hallucinations. She was depressed, angry, anxious, and irritable. [Tr. 310]. Her memory and concentration were poor. *Id.* She was diagnosed with major depressive disorder with psychotic features, panic attacks with agoraphobia, alcohol abuse, chronic pain, arthritis, and a GAF score of 56. [Tr. 311]. Ms. Hernandez recommended outpatient mental health treatment.

In August 2011, Plaintiff saw Dr. Cindy Ruttan, D.O., for a psychological evaluation. [Tr. 386-89]. She reported depression, anxiety, thoughts of death, and auditory and visual hallucinations. Plaintiff was alert and oriented, her speech was normal, her eye contact was good, her affect was congruent, her immediate memory was intact, her long-term memory was slightly impaired, and she denied suicidal or homicidal ideation. TR-387. Dr. Ruttan diagnosed panic disorder, mood disorder, bipolar disorder, and a GAF score of 50. She recommended therapy and a sleep evaluation.

Also in August 2011, Keith L. Allen, Ph.D., a non-examining, state agency consultant, completed a Mental Residual Functional Capacity Assessment. [Tr. 342-44]. He opined that Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods, interact appropriately with the general public, and travel to unfamiliar places, but was not significantly limited in any other area of mental

5

functioning. [Tr. 342]. He also completed a Psychiatric Review Technique. [Tr. 330-40]. He opined that Plaintiff had mild limitations in activities of daily living and social functioning, moderate limitations in concentration, persistence, or pace, and no episodes of decompensation of extended duration. Plaintiff could perform simple, repetitive tasks that did not require routine interaction with the general public. *Id.* As part of his review of the records, Dr. Allen also summarized the Third-Party Function Report provided by Plaintiff's husband. *Id.* Dr. Allen noted that Plaintiff's husband reported being separated from her and not spending much time with her and that she was able to follow instructions "ok," shop, manage her finances, and drive without difficulty. *Id.*

Plaintiff attended outpatient mental health treatment with Dr. Ruttan from May 2011 to September 2012. [Tr. 307, 317-18, 369, 373-74, 386-91]. Plaintiff reported hallucinations, paranoia, and difficulty sleeping; however, she also reported that her impairments improved with medication. [Tr. 370-72, 375-76]. Dr. Ruttan regularly observed that Plaintiff was oriented, her dress was appropriate, her speech was goal-directed, her affect was blunted but appropriate, her memory, cognition, and judgment were intact, and her insight and impulse control were good to fair.

### B. Function Reports

On April 19, 2011, Plaintiff's husband, Reginald Harris, completed a Third-Party Function report in connection with Plaintiff's application for benefits. [Tr. 170-77]. He stated that Plaintiff was in pain on the days that he talked to her and that she cried about her pain and depression. She was not the same since having shoulder surgery. He also stated that she had problems with personal care and that her conditions affected every

6

area of her physical or mental functioning, except for her memory and talking. Plaintiff prepared meals two or three days a week, left the house unaccompanied, shopped in stores for food, paid bills, counted change, handled a savings account, and used a checkbook or money orders. Plaintiff could get along with authority figures, follow written and spoken instructions "ok," and pay attention for "a while." Plaintiff's condition had affected their marriage and that they were separated.

In April and September 2011, Plaintiff completed her own function reports. [Tr. 179-89, 200-03]. Plaintiff spends her day taking her medication, soaking in the tub due to her pain, and trying to get medical help. She stated that she has problems with personal care. She does light cooking twice a week and can sweep, iron, make the bed, and do dishes and laundry, although she has someone do these things for her. She drives, shops for groceries, pays bills, counts change, handles a savings account, and uses a checkbook or money orders. She needs someone to accompany her when she leaves the house. She also said that her conditions affect every area of physical and mental functioning, except for talking, hearing, following instructions, and getting along with others. She can follow written and spoken instructions, although paying attention is difficult on some days due to pain.

### C. ALJ's Decision

After a hearing, an administrative law judge (ALJ) determined Plaintiff had the following severe impairments: post-traumatic stress disorder, schizoaffective disorder, borderline personality disorder, panic disorder, insomnia, plantar fasciitis, and left eye blindness, which is congenital. [Tr. 13]. Plaintiff has the residual functional capacity

7

(RFC) to perform light work, including lifting and carrying ten pounds frequently and twenty pounds occasionally and sitting six hours per workday. Plaintiff can stand and walk six hours per workday as long as she is allowed the option to alternate sitting and standing. She cannot climb ladders and can only occasionally climb stairs, balance, stoop, kneel, crouch or crawl. She cannot perform overhead reaching. She is limited to simple, unskilled work due to memory loss and emotional impairments. She is limited to occasional contact with coworkers, supervisors, and the public, due to anxiety. She cannot work around hazards due to left eye vision loss. [Tr. 15]. With the assistance of a vocational expert (VE), the ALJ determined Plaintiff could no perform her past relevant work, but could perform work that exists in significant numbers in the national economy, including as a photocopy machine operator or a surveillance system monitor. [Tr. 20].

In reaching his decision, the ALJ considered Plaintiff's medical records, the opinions of Drs. Hendler, Lee, and Allen and Ms. Epperson, Plaintiff's testimony, her work history, and her activities of daily living. [Tr. 16-19]. The ALJ gave "significant weight" to the consultative opinions of Dr. Hendler, Dr. Lee, and Dr. Allen. [Tr. 19]. The ALJ also observed that two examining physicians remarked that Plaintiff exaggerated her symptoms, that Plaintiff's mental impairments improved with medication, and that Plaintiff had low earning and significant breaks in employment "suggesting [she] was not highly motivated for long term, permanent employment." [Tr. 18].

## II. Discussion

The Commissioner's findings are reversed "only if they are not supported by substantial evidence or result from an error of law. In this substantial-evidence

determination, the entire administrative record is considered but the evidence is not reweighed. Substantial evidence is less than preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). So long as the Commissioner's decision is supported by substantial evidence, the Court will not reverse even if the Court would reach a different conclusion or if substantial evidence also supports a contrary conclusion. *Id.*

Plaintiff argues that the ALJ's opinion is not supported by substantial evidence because the ALJ 1) failed to include Plaintiff's nonexertional impairments in the RFC determination; 2) failed to discuss the Third-Party Function Report filled out by her husband; 3) relied on consultative reports instead of the full medical record; and 4) provided a defective hypothetical to the VE.

**A. Consideration of Nonexertional Impairments in RFC**

Plaintiff argues that in determining her RFC, the ALJ did not include nonexertional restrictions imposed by pain or mental impairments. [Doc. 14, p. 9]. Plaintiff contends that the ALJ could not rely solely on the Medical-Vocational Guidelines in 20 C.F.R. Part 404, Subpart P, Appendix 2, and was instead required to use a vocational expert who could consider the effect of nonexertional limitations such as pain on Plaintiff's ability to work. *Id.* at 7.

"In determining whether there are jobs available that a claimant can perform, the Secretary must consider the claimant's exertional and nonexertional impairments, together with the claimant's age, education, and previous work experience." *Talbott v. Bowen*, 821 F.2d 511, 515 (8th Cir. 1987). The Eighth Circuit has held that where a

9

claimant suffers from a nonexertional impairment, such as pain, that significantly limits her ability to perform the full range of work contemplated by the Medical-Vocational Guidelines, the ALJ may not rely on the guidelines to satisfy the Commission's burden of proof, but must instead produce expert vocational testimony. *Id.*

Contrary to Plaintiff's argument, the ALJ did produce a VE, Julie Finnegan, to testify as to whether Plaintiff could perform her past relevant work or other work existing in significant numbers in the national economy. [Tr. 56-63]. The ALJ also specifically included limitations related to Plaintiff's pain and mental impairments when he asked the VE for her expert opinion. The ALJ restricted Plaintiff to no bilateral, overhead reaching due to shoulder pain, simple, unskilled work of SVP 2 or less "as a result of a loss of memory and due to [her] mental impairments," a "sit/stand option but one that would be at will" as a result of her heel pain, and limited contact with coworkers, supervisors and the general public "as a result of [her] mental impairments and agoraphobia." [Tr. 57-8]. Further, in her Social Security brief, Plaintiff does not list any other nonexertional impairment that the ALJ should have considered or how those impairments would affect the ALJ'S RFC determination. Therefore, Plaintiff's first argument is unpersuasive.

## B. Discussion of Third-Party Function Report

Plaintiff next argues that the Commissioner's decision is not supported by substantial evidence in the record because the ALJ failed to mention or discuss a Third-Party Function Report submitted by Plaintiff's husband. [Doc. 14, pp. 11-12].

"In addition to medical evidence, when determining RFC, the ALJ must consider the observations of treating doctors and others and the claimant's own description of her

10

limitations." *Willcockson v. Astrue*, 540 F.3d 878, 880 (8th Cir. 2008). Statements of lay persons regarding a claimant's condition must be carefully considered when an ALJ evaluates the credibility of a claimant's subjective complaints. *Id.*

The ALJ did not mention or discuss the Third-Party Function Report submitted by Plaintiff's husband. Plaintiff, citing to *Willcockson*, argues that the ALJ's failure to consider the report requires reversal of the Commissioner's decision. In *Willcockson*, the claimant submitted lay testimony from her mother, daughter, and sister. The ALJ did not discuss or mention this testimony in his decision. *Id.* at 880. The Eighth Circuit observed that it could not tell from the record whether the ALJ overlooked the statements, gave them some weight, or completely disregarded them. In determining that the failure to discuss lay testimony was "another reason supporting [its] decision to remand," the Eighth Circuit stated that though an ALJ is free to reject lay testimony, "it is almost certainly error simply to ignore it altogether." *Id.* at 881.

However, after *Willcockson*, the Eighth Circuit decided *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011). Like the ALJs in *Willcockson* and this case, the ALJ in *Buckner* did not expressly address statements by a third-party witness, and the Eighth Circuit acknowledged that it could not determine from the ALJ's decision whether the lay testimony was disregarded or overlooked. *Id.* at 560. Nonetheless, the Eighth Circuit concluded that remand was not necessary because the same evidence that the ALJ referred to in discrediting the claimant's claims also discredited the lay witness' claims. *Id.* The Eighth Circuit further distinguished *Buckner* from *Willcockson* by stating that in *Willcockson* there were other deficiencies in the ALJ's opinion outside of his failure to

11

analyze lay witness testimony and that the ALJ's "arguable deficiency in opinion-writing technique" in *Buckner* had no bearing on the outcome of Buckner's case. *Id.*

This case is more factually similar to *Buckner.* While the ALJ did not discuss the Third-Party Function Report filled out by Plaintiff's husband, the ALJ gave several, supported reasons why Plaintiff's claims were not entirely credible. Because Plaintiff's husband's report is largely duplicative of her own report and testimony, the same reasons used to discredit Plaintiff's testimony also discredit her husband's report. For example, while Plaintiff stated that she had hallucinations, paranoia, and depression, Plaintiff did not seek treatment until nearly two years after her alleged onset date, and when treated with medication, these impairments significantly improved. Having the option to rest helped her heel pain. [Tr. 17-18]. Examination findings were relatively normal. The ALJ also observed that during two separate medical examinations, Plaintiff exaggerated her symptoms of pain. *Id.* Plaintiff also had a poor work history, had legal custody of and cared for her young grandson, went grocery shopping, could drive, pay bills, count change, and manage a checking account. [Tr. 18, 173, 182]. She also stated she could do some household chores such as sweeping, laundry, dishes, ironing, household repairs, and making the bed, although she had someone do them for her. [Tr. 181]. Further, while the ALJ did not expressly discuss Plaintiff's husband's report, the ALJ reviewed and gave "significant weight" to the opinion of state agency consultant Dr. Keith Allen who specifically talked about her husband's report. [Tr. 340]. Dr. Allen observed that in the report, Plaintiff's husband stated that he did not spend much time with Plaintiff because they were separated. [Tr. 340, 170, 172-73]. The ALJ's failure to explicitly discuss the

12

Third-Party Function Report is a deficiency in opinion writing, but this deficiency alone has no bearing on the outcome of Plaintiff's case and therefore, does not require remand.

## C. Reliance on Consultative Reports

Plaintiff next contends that the ALJ's RFC is not supported by substantial evidence because the ALJ relied on medical opinions by physicians who did not have the benefit of reviewing subsequent medical records. [Doc. 14, p. 12]. "The ALJ should determine a claimant's RFC based on all relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations. Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

The ALJ gave significant weight to the November 2009 opinion of Dr. Lee and the August 2011 opinion of Dr. Hendler. [Tr. 19]. Neither Dr. Lee nor Dr. Hendler were treating physicians, but examined Plaintiff before writing their decisions. The ALJ also gave significant weight to the opinion of Dr. Keith Allen, who was a non-treating, non-examining consultant. *Id.* Plaintiff argues that the ALJ's RFC is not supported by substantial evidence because several medical records exist after these opinions were issued which supports Plaintiff's testimony and if considered, "would have substantially bolstered her credibility." However, the ALJ explicitly discussed the subsequent medical records in his decision. The ALJ discussed medical records regarding Plaintiff's physical impairments from January to July 2012 and records regarding Plaintiff's mental impairments from August 2011 to September 2012. [Tr. 16-17]. The ALJ also remarked

13

that Drs. Lee and Hendler were due significant weight because their assessments were supported by a "thorough view of claimant's medical treatment history" suggesting that the ALJ compared their opinions with the more recent evidence he discussed in his opinion. [Tr. 19]. The ALJ also imposed greater restrictions than provided by these doctors. For instance, the ALJ included a sit/stand option whereas both Drs. Lee and Hendler opined that Plaintiff's ability to stand or walk was unlimited. [Tr. 228, 327]. As to Dr. Allen's opinion regarding her mental impairments, subsequent medical records revealed that Plaintiff reacted well to medication, and although "doing better" does not indicate an ability to function in a competitive work environment, Plaintiff cites to no medical record imposing greater restrictions than given by the ALJ.

Acknowledging that the ALJ did discuss her more recent medical opinions, Plaintiff nonetheless argues that in discussing the opinions, the ALJ attempted to substitute his own opinion for that of a medical professional. [Doc. 14, at p. 14]. In support of this argument, Plaintiff cites to the portion of the ALJ's decision where he states that Plaintiff's mental impairments improved with medication. However, the ALJ was merely summarizing the records. A February 2012 medical records states that her auditory hallucinations "decreased to nothing," that she was sleeping better, and that she was "overall 80% better." [Tr. 376]. In April 2012, she reported that her hallucinations did not bother her or were not noticeable and that she has moderate paranoia. [Tr. 375]. In July 2012, she reported that the medication helped the auditory hallucinations and that her paranoia "comes and goes." [Tr. 371]. In September 2012, she reported that the sounds stopped and that her paranoia improved by 45%. [Tr. 370].

14

Case 4:14-cv-00031-NKL   Document 18   Filed 11/06/14   Page 14 of 16

Further, Plaintiff acknowledges that in determining her RFC, the ALJ was required to look at all of the evidence in the record, not just the medical evidence. [Doc. 14, p. 14]. The ALJ discussed medical opinions, medical history, work history, activities of daily living, Plaintiff's testimony, and the effectiveness of medication. Therefore, the ALJ's RFC determination is supported by substantial evidence in the record.

### D. Hypothetical Give to VE

Plaintiff's last argument is that the ALJ's hypothetical to the VE was defective because it did not include all of Plaintiff's impairments established by the substantial evidence on the record as a whole, including the Third-Party Function Report and the medical evidence acquired after Drs. Lee, Hendler, and Allen issued their opinions. [Doc. 14, p. 15]. However, as discussed above, the restrictions set forth in the Third-Party Function Report that were not incorporated in the RFC were similar to the restrictions complained of by Plaintiff herself, and those complaints were not credible. As to the more recent medical records, the ALJ included restrictions in the RFC from these medical records. Plaintiff, citing *Douglas v. Bowen*, 836 F.2d 392 (8th Cir. 1987), argues the ALJ's RFC was imprecise and therefore, any opinion by the VE cannot constitute substantial evidence. [Doc. 14, p.16]. However, other than stating that the ALJ should have considered and incorporated more recent medical evidence in the RFC – which he did – and should have included the restrictions found in the Third-Party Function Report – discussed above – Plaintiff gives no specific restrictions that should have been included in the RFC to cure the alleged "imprecision" and cites to no medical record stating that Plaintiff had greater restrictions than found in the RFC.

15

Plaintiff argues that "[w]hen the ALJ questioned the [VE] with hypotheticals which included Plaintiff's nonexertional limitations, the [VE] answered in every case that Plaintiff would be unable to perform work in the national economy." *Id.* at 17. In the first hypothetical where the VE determined that no jobs existed, the ALJ asked the VE to imagine a claimant with the same RFC as Plaintiff's plus an additional restriction that Plaintiff would be unable to complete an eight-hour workday on an ongoing, consistent basis. [Tr. 62]. The second hypothetical, offered by Plaintiff's attorney, described a claimant that, "due to her mental health symptoms, her crying spells, the panic attacks, [and] the agoraphobia . . . would be off task up to 20 percent of the workday." [Tr. 62-3]. However, neither of those hypotheticals presented to the VE is supported by substantial evidence in the record, and Plaintiff has cited to no evidence in support of why either of them should have been the basis of the ALJ's RFC determination. Accordingly, the hypothetical presented to the RFC was sufficiently precise, and the ALJ's reliance on the VE's conclusions constitutes substantial evidence in the record.

## III.  Conclusion

For the reasons set forth above, the ALJ's decision is supported by substantial evidence in the record. Accordingly, the Commissioner's decision is affirmed.

s/ Nanette K. Laughrey<br>
NANETTE K. LAUGHREY<br>
United States District Judge

Dated:  November 6, 2014
Jefferson City, Missouri